IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                     Petitioner,

     v.

NEUROSCIENCE, INC.,
PHARMASAN LABS, INC. and
WHEATON PARTNERS, LLC,

               Respondents.

OPINION AND ORDER

14-mc-003-slc

This is a petition by the United States of America to compel respondents, NeuroScience, Inc. ("NeuroScience"), Pharmasan Labs, Inc. ("Pharmasan") and Wheaton Partners, LLC (which does business under the name of "CodeMap" and will be referred to as such herein), to comply with three Authorized Investigative Demands issued pursuant to 18 U.S.C. § 3486 in connection with the government's investigation of NeuroScience and Pharmasan for potential violations of federal healthcare laws. NeuroScience and Pharmasan have opposed the petition, asserting that many of the documents the government seeks are privileged. As discussed below, respondents' various claims of privilege are uniformly unpersuasive. Respondents must comply with the government's Authorized Investigative Demands.

This dispute revolves around documents collected and generated by CodeMap during its 2012 and 2013 audits of Pharmasan and NeuroScience, along with communications between CodeMap and Pharmasan/NeuroScience during the audit process. Respondents claim that these documents all are protected by the work product privilege, by the attorney-client privilege, or both. NeuroScience and Pharmasan further contend that CodeMap was an agent of their

attorneys, and therefore cannot waive any attorney client privilege or work product protection; therefore, respondents are asserting these privileges on CodeMap's behalf.

On November 21, 2014, this court directed NeuroScience and Pharmasan to submit for *in camera* review the documents for which they are claiming privilege, along with a privilege log and an explanation of the grounds on which each document has been withheld.  Dkt. 31.  Having reviewed those 237 documents, the supporting briefs and the affidavits filed in opposition to the government's petition, I find that respondents have failed to meet their burden of establishing that any of these documents is protected by either the work product or attorney-client privilege.  Accordingly, the government's petition will be granted.

The following facts are drawn from respondent's submissions:

## FACTS

### I.  Background

Pharmasan and NeuroScience are Wisconsin corporations owned by Gottfried and Mieke Kellerman.  Pharmasan is a laboratory that provides testing services.  NeuroScience is a related corporation that, among other things, interprets results of the lab tests performed by Pharmasan.  In addition, the two companies have an agreement whereby NeuroScience does all of the sales, marketing and billing for Pharmasan, including the CPT (Current Procedural Terminology) code billing and accounting.

Respondent Wheaton Partners is an Illinois limited liability company that does business under the name of CodeMap.  Most of CodeMap's work is performed by partners Charles and Greg Root.  The company specializes in regulatory compliance, providing assistance with coding

reimbursement and billing issues for diagnostic providers.  CodeMap provides its clients with general question-and-answer services, which it bills at an hourly rate.  In addition, if requested, Codemap will provide its clients with a fixed-fee compliance audit.  When CodeMap conducts these audits, it follows guidance issued by the Office of the Inspector General for the U.S. Department of Health and Human Services.  The focus of this standard-but-specialized audit is on how the laboratories interact with federal programs, such as Medicare and Medicaid, and with other healthcare providers.

Henry M. Helgen, III, is a partner and practicing attorney with the law firm of Anderson, Helgen, Davis and Nissen, P.A. ("AHDN").  Helgen has represented NeuroScience and Pharmasan as litigation counsel since January 2004.  Over the years, the scope of his representation has expanded to include other aspects of the company's business, to the point that Helgen now serves effectively as the company's outside general counsel.

## II.  September 2012:  NeuroScience Engages CodeMap to Perform a Compliance Audit

On August 24, 2012, NeuroScience's Insurance Billing Manager, Richard Forrest, resigned abruptly, cleaned out his office and left without notice.  Forrest's sudden departure alarmed NeuroScience's Chief Financial officer, Brent Bublitz, because Forrest had been the sole individual at the company responsible for determining which CPT codes were required to be used for submitting claims to insurers and Medicare and no one else at the company was trained to do Forrest's job.  To temporarily address this staffing gap and simultaneously address the company's concern that Forrest had left a billing mess in his wake, Bublitz hired CodeMap to review NeuroScience and Pharmasan's billing system.  Initially, Bublitz's intent was to have

CodeMap simply review Pharmasan's CPT codes.  Ultimately, however, he determined that CodeMap should conduct its full, flat-fee compliance audit so that NeuroScience and Pharmasan could find out "if there was a problem and how to fix it."  Aff. of Brent Bublitz, dkt.12, ¶15. Bublitz entered into a contract with CodeMap on September 11, 2012.  *In Camera Doc. #3.*

CodeMap began its audit soon thereafter, beginning with the CPT coding review.  This review was performed by Charles Root.  In an email to Bublitz on October 8, 2012, Root explained that he had determined that a number of CPT codes that NeuroScience had been using were incorrect and had resulted in Pharmasan being both overpaid and underpaid by Medicare and other insurance companies.  Root recommended that Pharmasan disclose the overpayment voluntarily within 60 days, and that it retain legal counsel to help with the mechanics of refunding the overpayments.

Meanwhile, attorney Helgen had other concerns about Forrest's sudden departure. NeuroScience's General Manager, Wayne McCune, had told Helgen that, before he resigned, Forrest had been evasive when questioned about insurance billing matters and that the Sherwood Clinic had expressed concern about the propriety of certain CPT codes that Forrest had provided.  Further, on or about October 5, 2012, Helgen had spoken to a NeuroScience sales representative who told him that Forrest had contacted her and told her that NeuroScience had engaged in fraudulent billing practices and that Forrest was working with the Department of Justice to "bring down" the company.  Based on this and other information, Helgen consulted with NeuroScience's owner, Mieke Kellerman, to consider whether NeuroScience should a civil complaint against Forrest.

4

Attorney Helgen communicated frequently with Kellerman during this time period and was aware that CodeMap had discovered a number of coding errors that had led to overpayments to Pharmasan.  On or about October 17, 2012, Helgen, Charles Root and Kellerman agreed that AHDN should supervise the remainder of CodeMap's audit activities so that "[Helgen] can claim attorney/client privilege on all communications and work product." Bublitz Aff., dkt. 12, exh. 4.

On November 13, 2012, NeuroScience and Pharmasan filed suit against Forrest in this court, alleging RICO violations, theft, tortious interference and fraud.

That same day, on November 13, 2012, Greg Root from CodeMap forwarded to Helgen a Services Proposal indicating that counsel, as attorney for Pharmasan Labs, had retained CodeMap to perform a "baseline" compliance audit.  The Services Proposal specified CodeMap's role:

> Our work, to be performed under your direction, is to perform a baseline compliance audit of Laboratory's operations.  The compliance audit will follow the guidelines and recommendations contained in the Office of Inspector General of the Department of Health and Human Services ("OIG's") compliance program guidance for clinical laboratories as further described in the attached Services Proposal.  We understand that our analysis and consultation will be performed to assist Counsel in representing Laboratory in this matter and in any potential litigation related to this matter and as such is subject to the attorney-client privilege and work product protections.

> *In Camera* Doc. No. 72.

The Agreement contained signature lines for representatives from CodeMap, the Anderson, Helgen firm and Pharmasan. Although Attorney Pam Nissen at AHDN signed the

Agreement in December 2012, it appears that the agreement never was signed by anyone at Pharmasan.

Notwithstanding the lack of an executed Services Proposal, the Roots, Bublitz and Helgen have testified that it was their understanding that, from approximately October 15, 2012 until CodeMap issued its final audit report in May 2013, CodeMap was proceeding with the audit under the direction and supervision of counsel.  At the same time, however, everyone also agrees that counsel really did not provide much "direction" to CodeMap at all.  Greg Root of CodeMap explained:

> [T]hough the language of the [Services Proposal] said that Counsel was directing the audit, CodeMap was ultimately free to do what we saw fit.  Counsel knew what we were doing and was aware of our findings.  As far as how we did the audit, the decisions were left up to Charles [Root] and me.  The day-to-day work and ongoing performance of the audit was predominantly CodeMap's responsibility.

> Aff. of Greg Root, dkt. 17, ¶17.

> *See also* Aff. of Brent Bublitz, dkt. 12, ¶28:

> It is my understanding that Counsel was not directing, nor was NeuroScience or Pharmasan, the audit or what work CodeMap was doing.  Unless an issue came up that NeuroScience or Pharmasan, or Counsel inquired about, our procedure was to simply let CodeMap conduct their review and the work that we contracted them for.

For example, counsel was not present when Greg Root visited Pharmasan and NeuroScience to meet with various employees, nor did counsel provide any instructions to CodeMap as to how it should conduct the audit or whether it should focus its review in any particular area.  As Charles Root explained:

6

> I did not expect Counsel to be active in supervising CodeMap's
> audit work or defining what work was to be done.  I understood
> Counsel's involvement to be mainly to protect Pharmasan's
> interest from a legal perspective, particularly since the audit
> engagement and scope had already been discussed and agreed to
> with Pharmasan.  By the time Counsel was involved, CodeMap
> already knew the work to be done and how to do it, so the legal
> oversight, as I understood it, was to maintain privilege.

> Aff. of Charles Root, dkt. 16, ¶31.

During the audit process, NeuroScience employees communicated frequently by email

with CodeMap and asked questions regarding various aspects of their billing system, including

coding, providers and Medicare regulations.  Generally speaking, CodeMap viewed these

communications as encompassed within the audit fee, although occasionally it might generate

a separate bill if questions were asked outside the audit.  With only a handful of exceptions,

counsel was not copied in on these emails.

On December 27, 2012, CodeMap forwarded a draft compliance report to AHDN for

review.  Through an oversight, the draft audit report was not sent to anyone at NeuroScience

until March 7, 2013.  On or about May 15, 2013, the final audit report was issued.

NeuroScience and Pharmasan have agreed to provide this final report to the government in

response to its Authorized Investigative Demands.


### III.  CodeMap's 2013 Compliance Audit

In August 2013, Bublitz engaged CodeMap to perform another compliance audit.

Bublitz did so because an annual audit is one of the OIG's requirements for laboratories.  Again,

the parties routed the engagement through AHDN with the express goal of keeping

communications from NeuroScience's employees regarding compliance issues confidential.

7

CodeMap conducted the 2013 audit in much the same way as it had conducted the 2012 audit. Again, counsel was not involved apart from being a party to the Service Agreement retaining CodeMap to perform the audit. It appears that CodeMap forwarded a draft of its 2013 audit to counsel and NeuroScience sometime in late 2013 or early 2014.

Around the same time that CodeMap was conducting its compliance audit, Pharmasan was receiving large demands for reimbursement from various insurance companies, including the Sherwood Clinic, Blue Cross and Blue Shield and Aetna, who alleged that Pharmasan had billed claims using an improper code for IgG testing.

## ANALYSIS

### I.  Work Product Privilege

Respondents in this case assert that communications between CodeMap and Pharmasan, between CodeMap and NeuroScience, and between CodeMap and the AHDN law firm— including Charles Root's initial CPT coding review, the 2012 draft audit report and the 2013 draft audit report—are protected from disclosure to the government by virtue of the attorney work product privilege. According to respondents, these documents were prepared in anticipation of litigation, namely: (1) the eventual lawsuit that respondents filed against Forrest on November 13, 2012; (2) potential claims by government entities such as the Department of Justice, Medicare or WPS for overpayments as a result of potentially incorrect CPT coding and billing; and (3) requests for reimbursement from third parties, including Sherwood Clinic, Blue Cross/Blue Shield and Aetna.

The work-product doctrine provides qualified protection to documents that are prepared in anticipation of litigation. *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983). The doctrine is broader in scope than the attorney-client privilege. *United States v. Nobles*, 422 U.S. 225, 238 n. 11 (1975) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)). Although the work product privilege developed to protect the work of an attorney from encroachment by opposing counsel, *Binks*, 709 F.2d at 1118, its protection has been extended to the work of both lawyers and nonlawyers. *See, e.g.,* Adv. Comm. Notes to 1970 Amendment to Rule 26(b)(3) ("[T]he weight of authority affords protection of the preparatory work of both lawyers and nonlawyers ...."). *See also Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 977 (7th Cir. 1996) (upholding work product protection of investigation report created by insurance company in anticipation of litigation); *In re Cendant Corp. Securities Litigation*, 343 F.3d 658 (3rd Cir. 2003) (recognizing that litigation consultants retained to aid in witness preparation may qualify as non-attorneys who are protected by the work product doctrine, including opinion work product doctrine).

The work-product doctrine protects (1) "documents and tangible things otherwise discoverable" (2) "prepared by or for another party or by or for that other party's representative" (3) "in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). The threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation of litigation. *Binks*, 709 F.2d at 1118. "The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad." *Id.* The Court of Appeals for the Seventh Circuit has explained that determining

9

whether the privilege applies requires distinguishing between materials prepared in the ordinary course of business "as a precaution for the remote aspect of litigation" and those prepared "because some articulable claim, *likely* to lead to litigation . . . ha[s] arisen." *Logan*, 96 F.3d at 977 (emphasis and alteration in original).  The burden is on the party asserting the privilege to show that anticipated litigation was the "driving force behind the preparation of each requested document." *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992)).

### A.  2012 Audit

Respondents have not met their burden of showing that documents associated with the 2012 audit were created in anticipation of litigation.  To the contrary, Bublitz's affidavit makes plain that his reason for engaging CodeMap was independent of any possibility of Forrest-related litigation.  As Bublitz explained, Forrest's abrupt departure left a huge knowledge gap in the company with respect to its billing practices, and more specifically, its billing codes.  According to Bublitz,

> NeuroScience's engagement of CodeMap in September 2012 was spurred by our realization that there was no one on staff who knew about billing codes.  We viewed CodeMap as an expert in this field and realized that if they could evaluate NeuroScience and Pharmasan's coding system and figure out what the codes should be, that would relieve NeuroScience or Pharmasan of the need to hire an employee to do the same.

> Bublitz Aff., dkt. 12, ¶12.

Although Bublitz acknowledged having heard from an Oregon company that had questioned the codes being billed, he specifically denied "know[ing] about litigation or other

legal issues that were going on." *Id*. at ¶14. All Bublitz knew was that "no one at NeuroScience or Pharmasan was an expert concerning coding and that NeuroScience had concerns about what issues were out there." *Id*.

Bublitz's explanation leaves no doubt that Pharmasan/NeuroScience hired CodeMap for *business* reasons, namely, to review its billing system to ensure compliance with the federal rules and regulations governing laboratories. In general, "documents prepared by a corporation as part of efforts to ensure compliance with federal regulatory agencies . . . and not because of possible litigation, are not protected by work-product doctrine." *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, No. 07–md–01871, 2009 WL 4641707, at *3 (E.D. Pa. Dec.7, 2009) (citing *In re Grand Jury Subpoena*, 220 F.R.D. 130, 157 (D. Mass. 2004) (ordinary compliance work of regulated industries constitutes the ordinary course of business and falls outside of work product protection)). *See also Graff v. Haverhill N. Coke Co.*, No. 1:09-CV-670, 2012 WL 5495514, at *3-6 (S.D. Ohio Nov. 13, 2012) (documents created to assess company's compliance with regulatory and corporate requirements in the ordinary course of its business not protected work product); *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 138 (D.D.C. 2012) (corporate internal investigation undertaken for purpose of determining existence and amount of overpayments that might be owed to government was conducted for business purposes, not to seek legal advice).

It is true that work product protection may be extended to a document that serves both business purposes *and* was prepared because of the prospect of litigation. Here, however, respondents have not established that the prospect of litigation played any part in Bublitz's decision to order the audit. Respondents point out that at the same time Bublitz decided to hire

11

CodeMap, attorney Helgen and Mieke Kellerman were concerned that Forrest might file claims against the company and were contemplating filing a suit against Forrest. However, there is no evidence from the audit documents themselves, from Bublitz's affidavit, or from any of the other background materials that Bublitz knew that Forrest was a possible whistleblower or that the company was considering a lawsuit against Forrest. Bublitz's affidavit reveals that at the most, he may have had general concerns about Forrest's competency and the possibility that Pharmasan and NeuroScience's billing practices were not in compliance with all the various rules and regulations. Nonetheless, "a generalized fear of litigation does not turn a compliance audit into attorney work product." *Lewis v. Wells Fargo & Co.*, 266 F.R.D. 433, 441 (N.D. Cal. 2010) (documents generated by Wells Fargo in connection with internal audits that were performed to determine whether various positions were properly classified as exempt from FLSA were created because of general compliance efforts and not because of any particular litigation). *See also Marceau v. IBEW Local 1269*, 246 F.R.D. 610, 614 (D. Ariz. 2007) (work product doctrine did not apply to documents generated as part of audit conducted a year before litigation was initiated because audit was aimed at on-going management issues facing company and not in anticipation of litigation).

The fact that CodeMap, NeuroScience and counsel arranged—*after* Charles Root had completed his coding review and Bublitz had engaged CodeMap for its standard, full-service audit—to shelter CodeMap's work behind counsel's coattails does not change this conclusion. Respondent's submissions make clear that this was a tactic designed solely to cloak the audit documents with the protection of the work product or attorney-client privileges. It is well-settled that "[p]arties may not create a privilege in otherwise nonprivileged business documents by

'funneling' or incidentally copying them to an attorney." *In re Brand Name Prescription Drugs Antitrust Litigation*, No. 94 C 897, 1995 WL 663684 at *2 (N.D. Ill. Nov. 6, 1995) (citing, inter alia, *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 324 (7th Cir. 1963)).  In spite of counsel's nominal involvement, respondents have presented no evidence to show that CodeMap changed the focus of its audit or conducted it any differently after it was agreed that the Services Proposal should be routed through counsel.   Indeed, notwithstanding the language of the Services Proposal which indicated that AHDN was "directing" the audit, AHDN in fact provided no direction at all.  As noted above, counsel left CodeMap to "do what [it] saw fit" and to conduct the audit just as it would have in the absence of counsel.  Respondents' contention that CodeMap was retained by counsel because of anticipated litigation is utterly unpersuasive.

Finally, respondents point out that AHDN "used" information gained from the CodeMap audit to provide legal advice to Pharmasan/NeuroScience.  However, the tests for attorney-client privilege and work product privilege do not examine how a particular communication later was used.  Rather, the focus is on the circumstances of the communication at the time it was made. Here, respondents have failed to show that the driving force behind the 2012 CodeMap audit was to prepare for litigation.   Rather, CodeMap conducted the audit at Pharmasan/ NeuroScience's request for the business purpose of ensuring they were following the billing practices recommended by the Office of Inspector General and were using the proper CPT codes. Merely because AHDN used some of this otherwise unprivileged information to advise its client does not establish that the materials were prepared "because of" litigation.

### B. 2013 Audit

This same rationale applies to the 2013 audit.  Respondents' materials indicate that Bublitz sought to retain CodeMap in the ordinary course of business in order to comply with the Inspector General's recommendation that laboratories undergo audits on an annual basis. Like the 2012 audit, the parties agreed to "route" the retainer for the audit through Helgen's office in order to maintain the confidentiality of the audit documents.  However, as with the 2012 audit, there is no evidence that CodeMap conducted its audit in anticipation of any particular litigation or that its activities were directed by counsel in any way.

Respondents' submissions show that, in mid- to late-2013, insurance companies such as the Sherwood Clinic, Blue Cross and Blue Shield and Aetna demanded that Pharmasan reimburse them for improperly coded claims.  A handful of documents reflect conversations between counsel and CodeMap concerning these demands and appear to be outside the scope of the 2013 audit.  *See, e.g.*, *In Camera Docs.* Nos. 199-202, 267, 276-278.  Insofar as respondents appear to be contending that these documents *also* are protected work product, again they have failed to carry their burden.

In particular, respondents have not shown that litigation was likely at the time that counsel was consulting with CodeMap about the reimbursement demands.  Neither of the demand letters in the record specifically threatens litigation, and counsel has not averred that he thought litigation was likely at the time he consulted with CodeMap.  Absent such evidence, this court has no basis to conclude that counsel sought CodeMap's advice in anticipation of litigation.  *Cf. Binks*, 709 F.2d at 1120 (letter of defendant holding plaintiff "fully responsible for any damages and expenses incurred" failed to establish likelihood of litigation); *Uresil Corp.*

14

*v. Cook Grp. Inc.*, No. 88 C 6171, 1989 WL 152525, at *3 (N.D. Ill. Dec. 1, 1989) (declining to find work product based on "reproachful" letter from plaintiff that merely demanded reimbursement without threatening litigation).

In sum, none of the documents submitted by respondents *in camera* qualify for work product protection.  They cannot be withheld from disclosure on this basis.

## II. Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  The attorney-client privilege prohibits the compelled disclosure of "confidential communications between a client and an attorney for the purpose of obtaining legal advice."  *Denius v. Dunlap*, 209 F.3d 944, 952 (7th Cir. 2000).  The privilege adheres "only if [the communications] constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence."  *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990).  The purpose of the privilege is to encourage full and frank communications between attorneys and their clients.  *Upjohn*, 449 U.S. at 389.

"However, since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."  *Fisher v. United States*, 425 U.S. 391, 403 (1976).  Because the privilege is in derogation of the search for the truth, "it must be strictly confined within the narrowest possible limits."  *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983).

The Seventh Circuit has adopted Professor Wigmore's formulation of the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Evans*, 113 F.3d at 1461 (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2292 (1961)).  "The party seeking to invoke the privilege bears the burden of proving all of its essential elements," *id.*, and "each of these elements must be established as to each document, as the mere existence of an attorney-client relationship is not sufficient to cloak all communications with the privilege."  *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 86 (N.D. Ill. 1992).

The attorney-client privilege only shields communications that were intended to be confidential; as a result, communications made to an attorney in the presence of a third party or made with the intent that they will be disclosed to a third party are not privileged. *United States v. Evans*, 113 F.3d 1457, 1462 (7th Cir. 1997); *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991).  An exception to this rule is that the presence of a third party will not defeat a claim of privilege when the third party is present to assist the attorney in rendering legal services. *Jenkins v. Bartlett*, 487 F.3d 482, 490-91 (7th Cir. 2007) (citing Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 183 at 312 (2d ed. 1994)).  This exception applies not only to agents of the attorney, such as paralegals, investigators and secretaries, but also to outside experts hired to assist the attorney provide legal services to the client, such as accountants, interpreters or polygraph examiners. *Id.* (quoting Mueller & Kirkpatrick, at 313).

16

This exception also covers retained experts when the expert assists the attorney by transmitting or interpreting client communications to the attorney or formulating opinions for the lawyer based on the client's communications. *Id*.

However, for the privilege to remain viable in this situation,

> the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only [consulting] service, or if the advice sought is the [consultant's] rather than the lawyer's, no privilege exists.

*United States v. Kovel*, 296 F.32d 918, 922 (2d Cir. 1961) (Friendly, J.) (emphasis in original) (citations omitted). Thus, "when a client's ultimate goal is not legal advice, but is rather accounting, medical, environmental or similar advice, the privilege does not apply." *In re Grand Jury Matter*, 147 F.R.D. 82, 84 (E.D. Pa. 1992). As stated in *Kovel*, at 921:

> Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam.

In this case, it is plain that CodeMap was "operating under its own steam" when it conducted the two compliance audits. As noted above, Pharmasan/NeuroScience initially engaged CodeMap for the 2012 audit completely on its own, without any direction from counsel. Nobody gave CodeMap any special instructions about what to do or how to do it; to the contrary, Codemap was hired to perform its standard, baseline audit to determine whether the company's billing and coding practices were in compliance with those recommended by the Office of the Inspector General. Charles Root conducted and completed his coding review and transmitted the results to Bublitz before anyone got the notion to restructure the relationship

17

so that CodeMap's bills would be paid by Pharmasan/NeuroScience's lawyers. Root's communications with NeuroScience and Pharmasan regarding coding, billing and payment issues clearly are not protected by the attorney-client privilege.

Even after counsel's post-hoc retention of CodeMap, there is nothing in the record that establishes that the focus of CodeMap's audits changed or that communications with CodeMap were made for the purpose of obtaining legal advice, as opposed to medical coding and billing advice. *See Cavallaro v. United States*, 284 F.3d 236, 247 (1st Cir. 2002) (agency relationship is relevant to, but not dispositive of, question whether agent was hired to assist lawyer in providing legal advice). CodeMap simply continued—in both 2012 and 2013– with the standard audit that it had intended to conduct all along.

At least one commentator has observed that "when the client has previously employed the agent independent of the attorney-client relationship, to perform the same services that he will perform for the attorney[,] . . . . [t]his creates a risk that the agent's retention by the attorney is simply a subterfuge." P.R. Rice, *Attorney–Client Privilege in the United States*,§ 3:5, at 33–34 (2d ed. 1999)(cited in *Cavallaro*, 284 F.3d at 249). *See also ISS Marine*, 905 F. Supp. 2d at 129 ("The respondent's claim to privilege appears to be premised on a gimmick: exclude counsel from conducting the internal investigation but retain them in a watered-down capacity to 'consult' on the investigation in order to cloak the investigation with privilege . . . this sort of 'consultation lite' does not qualify the Audit Report for the protections of the attorney-client privilege."). Here, as discussed above, there is no question that AHDN's retention of CodeMap was a subterfuge specifically designed to cloak the audits with privilege. Accordingly, the court rejects respondents' assertion of the attorney-client privilege based on an agency theory.

Finally, as above, the fact that some of the communications between NeuroScience/ Pharmasan and CodeMap may have helped AHDN formulate legal advice is not, in itself, sufficient to implicate the privilege.  Because the purpose of the privilege is to encourage clients to make full disclosure to their attorneys, "the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).


ORDER

IT IS ORDERED THAT:

(1) The government's petition to compel compliance, dkt. 1, is GRANTED.  Not later than February 24, 2015, respondents must furnish to the government complete and unredacted copies of all of the documents it has previously withheld on grounds of privilege, copies of which were produced, in two volumes, to the court ex parte and under seal.

(2) This order shall remain sealed until noon on February 12, 2015.


Entered this 10th day of February, 2015.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge